**IN THE COURT OF APPEALS OF IOWA**

No. 15-0766
Filed October 12, 2016


**IN RE THE MARRIAGE OF JULIE ANN JERVIK
AND KIRK BRADLEY JERVIK**

**Upon the Petition of
JULIE ANN JERVIK,**
　　　Petitioner-Appellant/Cross-Appellee,

**And Concerning
KIRK BRADLEY JERVIK,**
　　　Respondent-Appellee/Cross-Appellant.
_____


　　　Appeal from the Iowa District Court for Osceola County, Don E. Courtney,

Judge.


　　　A wife appeals and a husband cross-appeals from the district court's order

dissolving their marriage. **AFFIRMED AS MODIFIED.**


　　　R. Scott Rhinehart of Rhinehart Law, P.C., Sioux City, for appellant.

　　　Randy L. Waagmeester of Waagmeester Law Office, P.L.C., Rock Rapids,

for appellee.


　　　Heard by Doyle, P.J., McDonald, J., and Blane, S.J.*

　　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**BLANE, Senior Judge.**

Julie Jervik appeals and Kirk Jervik cross-appeals the district court's order dissolving their marriage.

Julie challenges the district court's property division, award of child support, and award of alimony. Specifically, she argues (1) the district court wrongly awarded her a marital asset that was no longer in either party's possession at the time of the dissolution; (2) the district court's valuation of the parties' business was incorrect; (3) the district court should have imputed more income to Kirk in determining the appropriate amount of child support and alimony; and (4) the district court should have awarded her at least twenty-five of any future personal injury award obtained by Kirk.

In his cross-appeal, Kirk asserts the district court did not properly address the parties' inherited and gifted property. Additionally, Kirk maintains the district court should have immediately reduced the temporary child support obligation and eliminated the alimony obligation after the hearing on the matter rather than waiting eight months; he asks that we either reduce the amount of the property settlement payment to Julie accordingly or give him credit against his future child support obligations. Finally, Kirk asserts his ongoing obligation to pay alimony is inequitable.

**I. Background Facts and Proceedings.**

The parties married in 1979. They have two children; one had reached majority and the other was nearly sixteen years old at the time of dissolution.

Kirk started his own electrical business in 1993, and it became his full-time employment in 1997. The business had varying success, with some years being

more profitable than others. As the only master electrician, Kirk was the "key man" in the operation. Although he sometimes had journeyman electricians on the payroll, he was required to supervise their work.

Julie worked outside of the home in an office position until 1985. She then focused on raising the parties' children. Julie helped with office work as needed for both her husband's and her parents' businesses; she did some bookkeeping, clerical work, and answering phones. She did not receive compensation. Otherwise, she did not work outside of the home. The parties' youngest child has been homeschooled since kindergarten, and Julie was responsible for overseeing her education.

Julie filed the petition for dissolution in late 2011. Both parties and the minor child continued to reside in the marital home.

In June 2012, following a contested hearing on the matter, the court ordered Kirk to pay Julie temporary child support of $1601 per month and temporary alimony of $1750 each month. This amount was based on Julie's financial affidavit and the court's findings that the five-year average of Kirk's income was $212,373.40 annually. Additionally, Kirk was ordered to pay $2500 toward Julie's attorney fees.

In October 2012, Julie and the minor child moved from the marital home to Sioux Falls, South Dakota. In 2013, after the parties' separation, Julie traded in the parties' 2006 Ford Expedition for a leased 2014 Kia Optima which she uses as her personal vehicle. She received credit on the lease of $5500 for the trade in.

On July 20, 2013, Kirk was involved in a serious work-related accident involving an electrical arc flash explosion. Kirk was transported to a hospital in Minnesota that specialized in burns; following his initial admission, Kirk spent over 120 days in the hospital recovering. As a result of the accident, Kirk had to have a number of operations—eighteen at the time of the dissolution trial —and he was readmitted to the hospital a number of times. Following Kirk's injury, the operations of the electrical business were suspended.

On April 30, 2014, Kirk filed an application to modify the temporary award of child support and alimony. He maintained he was unable to pay the support as ordered because he had not yet been able to return to work, and his only source of income was a disability insurance benefit payment in the amount of $1400 per month and income from the family farm operation. He requested an immediate modification.

The dissolution trial commenced the next day. At the trial, Julie testified she was still not employed outside of the home. She had not looked for employment in Sioux Falls, but she had inquired about taking some classes in order to obtain a license to sell real estate. Julie also testified she wanted to be awarded the marital home so she and the minor child could move back to Iowa. However, she acknowledged she could not afford the mortgage payments on the home without alimony, and she asked that Kirk be responsible for paying the mortgage. Kirk testified that he had not yet been able to return to work, and the operations of the electrical business were still suspended. Three days a week, he was engaged in physical or occupational therapy. He hoped to return to work in the near future, but his doctor instructed that he could not work more than four

hours per day. He hoped to regain his strength and stamina in order to work full-time, but he did not know when that would occur. Additionally, due to ongoing sensitivity to the sun and possible issues with heat and cold, it was unclear if Kirk would be able to take on jobs to be completed outdoors. If he is unable, this will preclude him from doing some of the work he had done before the accident.

Each party had an expert witness who testified about the value of the electrical business. Kirk's expert, Rachel Flaskey, testified that her valuation of the business before the accident was $388,000. However, her valuation at the time of trial was $194,000. She explained that approximately $190,000 of the difference was based on the depleted cash on hand and the accounts receivables. The $194,000 value assumed that Kirk was working in the business; if he was unable to return to work and sold just the assets of the business, she opined it would garner a net value of $124,000. Julie's expert, Richard Vander Werff, had completed his evaluation of the business before Kirk's accident; he was not asked to complete a second evaluation afterward. In his October 2012 valuation, he considered only the "core business assets" and found the business to be worth $280,000. He explained that amount did not include the cash on hand or the accounts receivable. However, that did anticipate Kirk would sell the business, sign a non-compete clause, and help a new owner transition into ongoing projects and current practices.

Additionally, each party claimed an inherited or gifted asset they believed should not be considered as marital property. Julie testified she had received approximately $82,000 in money from her parents' estate. She had kept that money separate since receiving it. At the time of trial, the amount had increased

by approximately $13,000 to $95,000 by "just leaving it in those investment accounts." Kirk claimed he and his four siblings had received a gift of land from his mother, and he believed his one-fifth interest was not marital property. In reality, when Kirk's grandparents died, Kirk's mother received a one-third interest in the property. Kirk and his siblings took out a loan to purchase the other two-thirds interest in the land. Although the loan was subsequently paid off with the proceeds from the land, Kirk and Julie both signed for the loan.

Finally, Julie asked the court to award her, at a minimum, a twenty-five percent interest in "any claims asserted by Kirk in civil proceedings regarding the injury he sustained in the arc flash explosion on July 20, 2013."

On January 9, 2015, the district court filed its findings of fact, conclusions of law, and dissolution decree. The court divided the marital assets and debts, including allocating $9575 to Julie for a vehicle she traded in prior to the dissolution. Additionally, the court found that all $95,000 of the money from Julie's inheritance was not a marital asset, so it was not included in the calculations. The court found the one-fifth interest in the farmland was not a gift, and Julie and Kirk were each allocated half the value of the interest in the farmland. The court valued the electrical business at $194,450 and awarded the business to Kirk, to which the parties agreed. Ultimately, the court found Kirk was leaving the marriage with $274,037 in assets while Julie had only $205,003. The court ordered Kirk to pay Julie six installments of $11,505.66 as an equalization payment.

Additionally, the court considered Kirk's monthly disability benefit of $1400 and his income from the farm and determined his annual income was $24,177.

The court imputed an income of $20,000 to Julie, "based on [her] work history and a finding that if actual earnings were used adjustments would be necessary to do justice between the parties." Using those numbers, the court ordered Kirk to pay Julie $336.59 per month in child support and $200 per month in traditional alimony until Julie dies or remarries. The new order for child support and alimony took effect on February 1, 2015. The court declined Julie's request to award her an interest in any future recovery made by Kirk regarding his injury; however the court reserved for Julie "any recovery for a consortium claim as a result of Kirk's injuries."

Both Julie and Kirk filed a motion to amend or enlarge. Julie maintained, among other things, the court's allocation of $9575 as an asset in her column was in error. She argued the court should not have placed any value on the vehicle since it was no longer marital property at the time of the dissolution.

Following a hearing on the motions, the district court modified the amount allocated to Julie for the vehicle trade in from $9575 to $5500.[1]

Julie appeals and Kirk cross-appeals.

**II. Standard of Review.**

We review dissolution cases de novo. *See* Iowa R. App. P. 6.907. "'Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses.'" *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006) (citation

---

[1] We note that in the original decree, the court entered judgment in favor of Julie in the amount of $69,034. After removing the difference in the vehicle award from her assets, the adjusted difference between Julie's net assets and Kirk's net assets should have been $73,109.

omitted). "Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence." *In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007).

**III. Discussion.**

### A. Award of Vehicle.

Julie maintains the district's court's allocation of the value of the traded-in vehicle to her was contrary to Iowa law because it was not an asset at the time of the dissolution.

Under the facts here, we agree with Julie. The issue arises due to Julie leasing rather than purchasing the new vehicle. If she had traded-in the Expedition and received $5500 for the trade of a purchased rather than leased vehicle, the purchased vehicle along with its $5500 in equity could be assigned to Julie as a marital asset. Since she entered into a lease, neither the Expedition nor the leased vehicle are owned and thus not subject to division as a marital asset. The question then shifts to whether Julie dissipated the asset—the $5500 of equity in the Ford Expedition by leasing rather than purchasing.

While the court may award the value of an asset to a spouse whose conduct has resulted in the loss or disposal of property otherwise subject to the division at the time of divorce if the court finds there has been dissipation or waste, "the [dissipation] doctrine does not apply if the spending spouse used the monies for 'legitimate household and business expenses.'" *In re Marriage of Kimbro*, 826 N.W.2d 696, 700–01 (Iowa 2013) (citation omitted). Here, there was no allegation that Julie wasted or dissipated assets. Kirk did not present evidence that Julie could have purchased rather than leased the new vehicle

under similar or more favorable terms. She testified she traded in the vehicle because it got poor gas mileage and was in need of repairs she could not afford. She used the trade-in value to lease a newer vehicle that got much better mileage, thereby saving her money in her monthly expenses. A vehicle that is in good operating condition, not in need of repairs, and gets better gas mileage is a legitimate household expense. As such, we remove the $5500 worth of trade-in value from her division of the assets, thereby leaving her with $195,428 in marital assets and Kirk with $274,037 in marital assets.

### B. Valuation of Business.

Julie maintains the district court's valuation of the electrical business-- $194,450—was inaccurate; she contends the district court should have used Kirk's expert's first valuation of $388,000. She maintains the "missing" cash and accounts receivable of approximately $190,000 were wasted or hidden by Kirk, and as such, they should have been counted in the value of the company.

Part of Julie's argument depends on her belief that suspending the business after Kirk's injury was unnecessary. Following his injury, she filed a motion to appoint herself as receiver for the business. Julie believed she could continue the business operations while Kirk was recovering. In response, Kirk asserted that Julie was not capable of running the business. The district court ultimately denied Julie's motion. At the dissolution trial, Julie testified she believed operations would not have been suspended if she was allowed to take over the business operation. She maintained she could have hired other electricians to bid and complete jobs, and she believed the loss of value in the business was due to the unnecessary suspension of operations. However, Kirk

and one of Kirk's witnesses, another master electrician, both testified they did not believe Julie, as a non-electrician, would have been able to operate the business. Julie did not have training or knowledge about electrical work; she was unable to oversee electricians, and she had never bid a project. The court found their testimony credible, stating in the dissolution decree, "The court finds from the evidence at trial that it was unlikely Julie could have found a master electrician to handle the business during Kirk's absence."

Next, we note that Kirk was not paid a regular salary from the electrical business. Rather, he and Julie had historically used the business's income to pay for their expenses by taking draws from the company's checking account as needed.[2] Kirk had been unable to work for over nine months at the time of the dissolution trial, and in the meantime he was paying Julie $3351 per month in alimony and child support. He also was paying the mortgage on the family residence, insurance for the entire family, and his own co-pays, deductibles, and personal-living expenses. Additionally, Kirk testified that some of the money had been used to pay an outstanding tax bill.

Before filing the temporary order, the court found Kirk's average yearly salary, based on his average draws from the business over a five-year period, to be $212,373.40. Comparably, even if Kirk drew approximately $190,000 from the business while he was unable to work, we cannot find such an amount was a waste or a dissipation of assets.

Moreover, we generally will not disturb the district court's valuation when it is within the range of permissible evidence. *See Hansen*, 733 N.W.2d at 703.

---

[2] According to the Flaskey, "[t]his is typical practice of a sole owner/operator."

Here, Kirk's expert testified that she believed the business was worth $194,000 at the time of trial. However, it was still not absolute that Kirk would be able to return to work, and she valued the sale of just the assets of the business at only $124,000. Julie's expert believed the business should be valued at $280,000 at the time of trial. However, that was based on an understanding that Kirk would sell the business, sign a non-compete clause, and help the new owner with the transitioning of the business. Additionally, Julie's expert testified that he had not realized Kirk was injured until he walked into the courtroom that day, and he had not considered that or completed an evaluation after Kirk's injury.

Here, the district court was clearly more persuaded by Kirk's expert, and the court valued the business at slightly more than she opined it was worth. Determining the value of a business is not an exact science. *See In re Marriage of McDermott*, 827 N.W.2d 671, 689 (Iowa 2013) (Appel, J., dissenting) ("In the end, establishing an appropriate property division in this case is a matter of art rather than science."); *see also In re Marriage of Conley*, 284 N.W.2d 220, 223 (Iowa 1979) (noting "equality does not need to be achieved with 'mathematical exactness'" (citation omitted)); *cf. In re Marriage of Dennis*, 467 N.W.2d 806, 808 (Iowa Ct. App.1991) ("Because of the difficulty of the task of valuation [of closely held corporations], the law provides much leeway to the trial court, even permitting the trial court to devise its own scheme for valuation."). The district court considered all of the relevant testimony and exhibits and determined a value that is "well within the range of evidence." *See In re Marriage of Wiedemann*, 402 N.W.2d 744, 748 (Iowa 1987). After our own review of the record, we do not believe the district court's valuation should be disturbed on

appeal. *See id.* ("While we do not necessarily adopt the trial court's methods, we believe the findings were well within the range of the evidence and should not be disturbed on appeal.").

**C. Kirk's Income for Child Support Purposes.**

Julie maintains the district court inaccurately calculated Kirk's income for purposes of determining child support and alimony. The court found that Kirk's income was $24,177 based on his receipt of $1400 per month in disability benefit and the average of his past income from the one-fifth interest in the farm. Julie maintains this is in error due to the approximately $190,000 taken out of the business and Kirk's testimony that he hoped to be able to return to working at the electrical business within a short period of time.

Even if Kirk took the $190,000 in draws from the company leading up to the dissolution, based on his expert's testimony, the business had only approximately $6000 cash on hand and $2000 in accounts receivables at the time of the dissolution hearing.[3] In other words, without Kirk returning to the business to generate revenue, that source of income ceased to exist.

Additionally, Kirk testified he hoped to return to work, at least part-time, within a few months of the dissolution trial. However, it was not yet clear if he would be able to do so or how many hours he would be able to do work if could. At the time of the dissolution trial, Kirk's income was comprised of the income from the farm and his disability benefit; we do not believe the district court's decision not to impute greater income to Kirk was inequitable or in error. *Cf. In re Marriage of Nelson*, 570 N.W.2d 103, 105 (Iowa 1997) ("All income that is not

---

[3] This $8000 was included in her valuation of the business at $194,000.

anomalous, uncertain, or speculative should be included when determining a party's child support obligations."). Rather, the more appropriate way to handle the situation is to wait until Kirk's change in income is no longer anticipatory and then file an application to modify the child support award. *See* Iowa Code § 598.21C(2)(a) (2011) (stating "a substantial change in circumstances exists when the court order for child support varies by ten percent or more from the amount which would be due pursuant to the most current child support guidelines").

### D. Personal Injury Award.

Julie maintains the district court should have awarded her at least twenty-five percent of any future award Kirk receives for a possible personal injury claim as opposed to only the award to her of her consortium claim. We note that Kirk had not filed any such personal injury claim at the time of the dissolution trial, and in fact, he was the defendant in a lawsuit involving the electrical arc explosion. Moreover, we do not believe Julie has a right to any part of a future recovery made after the dissolution. *See In re Marriage of Schriner*, 695 N.W.2d 493, 498–99 (Iowa 2005) (differentiating between benefits received during the marriage, which were to be treated as marital property, and benefits or proceeds received after the divorce is final, which were "separate property of the injured spouse"); *see also, e.g.*, *In re Marriage of Schmitt*, No. 15-1207, 2016 WL 3556462, at *3–4 (Iowa Ct. App. June 29, 2016 (considering all payments from a personal-injury structured settlement that were received during the marriage as marital property, but setting aside the payment that would be received after dissolution as nonmarital property). The court may consider benefits or a recovery "expected to be received by an injured spouse after the divorce as a

circumstance to justify an award to the other spouse of a larger portion of the property subject to the division." *See Schriner*, 695 N.W.2d at 499. But here, even if such a future recovery is possible, it is certainly not expected as no lawsuit or claim had even been filed at the time of dissolution.

**E. Alimony.**

Both parties dispute the district court's award of traditional alimony in the amount of $200 per month to Julie until she dies or remarries. Julie reiterates her argument that the district court should have found Kirk had a greater amount of income, and she maintains she should receive more than $200 each month. On the other hand, Kirk maintains his obligation to pay alimony should be eliminated. He argues his own standard of living has been greatly reduced following his injury and Julie has no physical impediment to being employed outside of the home.

We decline to disturb the district court's award of alimony. While there were no health reasons preventing Julie from seeking employment, she had been out of the workforce for approximately thirty years at the time of dissolution. She had no recent training or newly-acquired skills. Moreover, the parties had agreed she would not work outside of the home and would instead focus on raising and homeschooling the minor child.[4] Under these facts, traditional alimony is appropriate. *See In re Marriage of Gust*, 858 N.W.2d 402, 410–12 (Iowa 2015) (stating traditional alimony is often appropriate in marriages of more than twenty years, where one party was out of the work force for a long period of

---

[4] Kirk testified the parties agreed to homeschool the minor child until only third grade. However, the child clearly continued to be homeschooled well past that age, and both parties testified Julie was responsible for overseeing the child's education.

time). Due to the change in circumstances involving Kirk's health and the electrical business, the amount he can afford to give to Julie is greatly reduced. *See id.* at 408 ("The purpose of a traditional or permanent alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued."). We acknowledge Kirk was earning only $24,177 at the time of dissolution, but Julie had no income. While it was clear Julie would need to seek employment, it was unclear that she would be able to find more than minimum-wage work. Here, neither party will be able to enjoy the standard of living the parties had before Kirk's accident. Even if Julie is able to earn the amount of income the district court imputed to her—$20,000—Kirk still has a greater income. We believe $200 of alimony each month is equitable in this situation.

### F. Inherited and Gifted Property.

On cross-appeal, Kirk maintains the district court failed to equitably divide the "windfall" Julie received from her inheritance. Julie testified she received approximately $82,000 in money from her parents' estate, and that amount had appreciated to approximately $95,000 at the time of the dissolution hearing. Kirk maintains that because the money grew without any effort on Julie's part, the $13,000 difference in value should have been treated as marital property and divided between the two parties.

While there are situations where the court is to set aside the value of the inheritance at the time it was received—as opposed to its value at the time of trial—we do not believe this is one of them. *See In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995) (stating "in situations in which the inherited

property does not change in form following its receipt," the court should set aside as nonmarital the value of the asset at the time of trial.). Moreover, the inherited money was kept in accounts that were in only Julie's name from the time the inheritance was received until the time of trial. Neither the investment of the inheritance nor its appreciation bear any characteristics of a "family decision." *Cf. id.* (deciding the appreciation was a marital asset because the parties had made the "family decision" to use inherited money to purchase property during the marriage and had made mutual decisions how to use the property). Additionally, while Kirk focuses on the fact that Julie took no action to cause or generate the appreciation of the asset, we note that the increase in value was also not due to any of his actions. *Cf., e.g.*, *In re Marriage of Calhoun*, No. 13-0697, 2014 WL 250240, at *3 (Iowa Ct. App. Jan. 23, 2014) (awarding the husband part of the increased value of the wife's gifted farmland because it was "undisputed [the husband] made contributions to the farmland by expending money and labor improving the property—improvements which increased the value").

Next, Kirk maintains that his mother's one-third of the family farm was donated to him and his siblings—even though they purchased the other two-thirds interest—so at least one-third of his one-fifth interest was a gift to be set aside.[5] The district court was not persuaded by Kirk's claims regarding the property, and neither are we. Although Kirk maintains he and his siblings were

---

[5] Kirk also implicitly challenges the district court's finding that the one-fifth interest in the family farm was not a gift that should be set aside as a nonmarital asset. However, Kirk admits he and Julie took out a loan to cover the purchase price of the two-thirds interest. Although the proceeds from the land generally paid for the loan, it is clear that land was not a gift.

gifted their mother's one-third interest in the land, his brother testified otherwise, stating:

> Well, I don't even know it if was really called a gift because I don't think there's any—It's way above my head, but—because they still think we owe her for the third because we always agreed if mom ran short of money, we would give her money and on occasions we all send my mother somewhere. When my little brother got sick, all of us kids said, we've got to get mom out there to take care of [our brother], so we write a check out of the farm account to send her. We keep her house up. She's always lived in the house there [rent-free].

Moreover, even if the mother's one-third interest was a gift, there is no evidence in the record that her intent was to gift it to Kirk alone. Kirk and Julie were married at the time the land was acquired. When Julie was testifying about the farmland, she listed who was involved in purchasing the land, and she listed Kirk's siblings and corresponding spouses, as well as herself and Kirk.

We decline to modify the district court's ruling regarding Julie's inheritance or the family farm.

### G. Temporary Order.

Finally, Kirk maintains the district court should have modified his child support and alimony obligation following the trial rather than waiting to make the change when it filed the dissolution decree—approximately eight months later. Because the court did not file an order modifying Kirk's obligation before it filed the decree, Kirk maintains the court should have retroactively reduced the amount of support ordered from May 1, 2014 forward. At trial, Kirk testified he had taken two loans—in the amounts of $25,000 and $20,000—during the pendency of the case in order to meet his child support and spousal support obligations. He asserts these debts should have been allocated as marital debts

and offset the amount he was ordered to pay Julie in an equalization payment. In the alternative, he asks that we award him credit toward his future child support and spousal support obligations.

We agree the district court could have immediately modified the temporary order. *See* Iowa Code § 598.11(2) ("*If the order is not so modified*, it shall continue in force and effect until the action is dismissed or a decree is entered dissolving the marriage." (emphasis added)). However, here we do not believe it was necessary for the court to do so. Kirk was able to take approximately $190,000 in draws from the business, which the court considered salary rather than dissipation or waste, and he received approximately $24,000 in disability and farm income. Although he testified he took out approximately $45,000 in loans in order to meet his obligations, we believe he had sufficient funds to cover the temporary obligation until the dissolution decree was entered.

### H. Modification of Equalization Payments.

Based on our removal of the value of the trade-in vehicle from Julie's assets, Julie left the marriage with $195,428 in marital assets while Kirk left the marriage with $274,037 in assets. Although it is not necessary, upon our de novo review, we believe an equal distribution is equitable. *See In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007). As such, Kirk is to pay Julie one-half the difference in marital assets. We modify the decree to order judgment in favor of Julie in the amount of $39,304.50. Kirk is to make six payments in the amount of $6550.75 each under the same conditions as set out in the decree.

**AFFIRMED AS MODIFIED.**